# IN THE COURT OF APPEALS OF IOWA

—————————

No. 25-0205
Filed May 13, 2026

—————————

**Todd Hinkel,**
Plaintiff–Appellant,
v.
**Chad Hinkel,**
Defendant–Appellee.

—————————

Appeal from the Iowa District Court for Johnson County,
The Honorable Lars G. Anderson, Judge.

—————————

**AFFIRMED**

—————————

John C. Wagner, John G. Daufeldt, and Colin W. Smyka of John C. Wagner Law Offices, P.C., Amana, attorneys for appellant.

Peter C. Riley of Tom Riley Law Firm P.L.C., Cedar Rapids, attorney for appellee.

—————————

Considered without oral argument
by Tabor, C.J., and Badding and Sandy, JJ.
Opinion by Sandy, J.

**SANDY, Judge.**

On June 12, 2020, Todd Hinkel drove his ailing father to a parking lot in Johnson County, held him steady while he signed a deed, and verified his identity to the notary. Four years later, Todd asks this court to declare that his father lacked the mental capacity to do what Todd helped him do. We decline that invitation. Upon our de novo review, we affirm.

## BACKGROUND FACTS AND PROCEDURE

Dewey Hinkel was born in 1936 and owned a roughly ten-acre property in North Liberty, Iowa. Dewey and his wife, Patricia, had two children together: Todd and Chad. Patricia died in 2005 and Dewey died in 2022. This action was filed before Dewey's death.

Chad lived with Dewey on the property for multiple years until May 2020, when Dewey's health deteriorated and he could no longer live at home. It is undisputed that Dewey's physical health declined as he got older. On May 10, 2020, Dewey suffered a stroke and Chad brought him to the University of Iowa Hospitals and Clinics (UIHC). Dewey stayed at UIHC for ten days, until he was moved to a rehab facility. Dewey had to go back to UIHC when it became clear he needed more assistance than could be offered to him at home. Dewey ultimate moved to Solon Care Center in June, where he lived until he passed away in 2022.

After Dewey suffered his stroke, Chad became concerned about how the expenses from Dewey's time in the nursing home could affect his father's assets. Chad contacted Kyle Wilcox, an attorney who primarily practices in estate planning, taxation, and related matters, including Medicaid planning. None of the Hinkels knew Wilcox before Chad contacted him.

On June 8, 2020, Chad, Todd, and Wilcox had an hour-long meeting to discuss, among other things, how to protect Dewey's assets without having to sell them. Wilcox testified that generally someone cannot give away assets within five years of moving to a nursing home without those assets counting against them for purposes of Medicaid eligibility. An exception to this rule allows someone to convey their home to another person living in the home for two or more years. This was the case with Chad, and Wilcox discussed the possibility of Dewey deeding the property to Chad to protect it. Wilcox testified at trial that both Todd and Chad agreed to the plan, that he was representing Dewey, and that he needed to meet with Dewey to explain and see if he understood and agreed to the plan. Wilcox testified that both Chad and Todd told him that Dewey was competent to execute a deed at that time. Chad corroborated Wilcox's recollection of the meeting, but Todd testified that it went differently. Todd claimed that the meeting only lasted fifteen to twenty minutes, and that he did not understand nor have knowledge of the plan to convey the property to Chad. The district court did not find Todd's testimony credible.

The next day, Todd facilitated a phone call between Dewey and Wilcox. Wilcox testified that the call lasted approximately twenty to thirty minutes and that Dewey provided little feedback throughout the call. Wilcox testified that he was able to verify that Dewey wanted to proceed with the plan to deed the property to Chad. Chad testified that he discussed the conversation with his brother and that Todd said it went well without any issues. Wilcox then had the necessary documents prepared.

Wilcox never met Dewey in person, and he did not speak with Dewey on the day the deed was executed. He was also not fully aware of Dewey's health situation and was unaware of Dewey's will that provided for his

property to be divided equally between Chad and Todd. Wilcox was also unaware that Chad and Todd had a difficult relationship, and he testified that he would probably have proceeded differently knowing what he knows now. The district court found Wilcox's testimony to be credible.

Dewey signed the deed on June 12. The two other people present for the signing were Todd and Brandy Raschke, an employee of the law firm where Wilcox worked. Todd drove Dewey from UIHC to the signing, and Todd testified that Dewey was out of it that day. Todd testified that Dewey never said anything or asked any questions about any of the documents and did not read the documents before signing. Todd also testified that he had to help Dewey sign the documents.

Raschke prepared the deed transferring the property from Dewey to Chad at the instruction of Wilcox. Because of COVID-19 protocols in effect at the time, arrangements were made for Raschke to meet Dewey and Todd in the parking lot and to have Dewey sign the documents there. Raschke testified that Dewey did not speak the day they met, but that Todd did verify his identity for her. She further testified that she did not engage in an assessment of Dewey, but that she felt sad for him based on his physical condition. Raschke testified that Dewey had difficulty signing the documents and that Todd had to hold him up while he signed. Raschke also testified that she explained the documents to Dewey before he signed, but that he did not ask any questions or read the documents before he signed. She finally testified that Dewey's signature improved between the first and second document, and she confirmed it was not "the worst signature [she had] ever seen."

Chad and Todd's relationship came to a head after a dispute about Todd's use of the property, leading to Chad telling Todd that he nor his belongings were allowed on the property. Todd filed suit against Chad,

arguing that Dewey lacked the mental capacity to execute the deed. The district court's decree denied and dismissed Todd's petition in its entirety. Todd now appeals the decree.

## STANDARD OF REVIEW

"In equity cases review is de novo." Iowa R. App. P. 6.907; *see In re Est. of Roethler*, 801 N.W.2d 833, 837 (Iowa 2011). "In equity cases, especially when considering the credibility of witnesses, the appellate court gives weight to the fact-findings of the district court, but is not bound by them." Iowa R. App. P. 6.904(3)(g); *see Roethler*, 801 N.W.2d at 837.

## DISCUSSION

Todd argues that the district court erred in finding that he failed to carry his burden to show Dewey lacked the mental capacity to execute the deed which conveyed the property to Chad. Todd asserts the district court did not consider and properly weigh all relevant factors.

As the party challenging Dewey's capacity to execute the deed, Todd "carries the burden of proving by clear, convincing, and satisfactory evidence that" Dewey did not have "sufficient consciousness or mentality to understand the import of [his] acts when the deed was executed." *In re Est. of Todd*, 585 N.W.2d 273, 276 (Iowa 1998) (cleaned up). Clear and convincing evidence means there is "no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *In re N.C.*, 952 N.W.2d 151, 153 (Iowa 2020). When analyzing the issue of mental capacity, we consider several factors:

> [the grantor's] physical condition; the adequacy of consideration; whether or not the conveyance was improvident; the relation of trust and confidence between the parties to the conveyance, and the weakness of

> mind of the grantor as judged by his other acts within a reasonable time prior and subsequent to the act sought to be impeached.

*Daughton v. Parson*, 423 N.W.2d 894, 896 (Iowa Ct. App. 1998) (quoting *Brewster v. Brewster*, 188 N.W. 672, 674 (Iowa 1922)).

Upon our review, Todd did not prove by clear, convincing, and satisfactory evidence that Dewey lacked the capacity to execute the deed. We reach this conclusion by considering (1) the district court's credibility determinations; (2) conflicting testimony regarding Dewey's mental faculties around the time the deed was signed; (3) Todd's failure to retain any expert witnesses to testify to Dewey's capacity; and (4) the high burden the clear and convincing evidence standard imposes on Todd.

The district court "did not find Todd's testimony that he had no clue what was going on in connection with the deed from Dewey to Chad to be credible." Todd's claim that he had no idea what was going on is not consistent with Chad and Wilcox's testimonies, which the district court found more credible. In direct contravention with his testimony that he did not know what was going on with the deed, Todd still helped arranged for Wilcox to speak with Dewey, drove Dewey to sign the deed, and assisted Dewey in signing the documents.

Testimony from other witnesses was indeterminant as to Dewey's mental condition. Todd called several witnesses who testified that in the relevant timeframe, Dewey would get tired easily and was sometimes confused. Holly Hinkel, Todd's daughter and Dewey's granddaughter, testified that Dewey was often in and out of sleep, could not converse well, and did not seem like himself when she visited him on June 7, 2020. Holly also testified that when she spoke to Dewey on a video call on June 12 that he was unable to have much of a conversation and was not coherent. Bryce

Hinkel, who is also Todd's daughter and Dewey's granddaughter, testified that she observed Dewey to be confused during the relevant timeframe.

Todd also called two witnesses whose testimony was partially objected to by Chad: a social worker from Solon Care Center named Mandy Clarke, and a physician with UIHC who also sometimes worked at Solon Care Center named Dr. Scott Eberly. Todd did not retain either witness as an expert, and neither witness provided a "summary of the facts and opinions to which the witness is expected to testify" under Iowa Rule of Civil Procedure 1.500(2)(c). The district court took evidence from both witnesses nonetheless. Based on his observations, Dr. Eberly testified that Dewey sometimes had trouble responding to questions and would avoid responding to difficult questions. Mandy Clarke testified to mostly the same. Of note, neither witness testified that Dewey was incompetent.

Although Chad did not see Dewey on June 12, he testified that in the several times he saw Dewey leading up to the signing that Dewey was groggy and a little confused when he woke up but was fine otherwise. Chad also called several witnesses, all of whom testified that despite Dewey's physical decline, he did not appear to have any cognitive issues. One of the witnesses Chad called was Amy Donnelly, one of Dewey's closest friends. Donnelly testified that she had regular contact with Dewey, seeing him or speaking with him on the phone almost every day. She testified that although she observed a physical decline, Dewey's cognitive health appeared to be fine. While Donnelly did not see Dewey on June 12, she testified that she never observed Dewey to be confused or mentally impaired. Donnelly had the most contact with Dewey outside of family members and did not have an interest in the outcome of this case.

It is clear that Dewey was in poor physical health during the timeframe he deeded the property to Chad. He also seemed to be somewhat confused around that timeframe. But our supreme court has reiterated:

> Mere mental weakness in a grantor will not invalidate a deed. To have that effect, the mental powers must be so far deteriorated or destroyed that the grantor is incapable of understanding in a reasonable degree the nature and consequences of the instrument he executes.

*Conservatorship of Geerdes v. Cruz*, 7 N.W.3d 22, 35 (Iowa 2024) (citation omitted). The conflicting lay testimony and the lack of expert testimony regarding Dewey's mental state, along with the district court's determination that Todd's testimony about Dewey's competency was "somewhat suspect," all points toward the conclusion that Todd did not meet his high burden. We agree that the evidence as to whether Dewey lacked capacity when he signed the deed is unclear, but Todd has the burden to prove by "clear convincing, and satisfactory evidence that [Dewey] failed to possess sufficient consciousness or mentality" at the time the deed was executed. *See Todd*, 585 N.W.2d at 276 (cleaned up).

Todd also argues the district court did not properly weigh the lack of consideration, lack of independent counsel, or the improvidence of the execution. But Wilcox did represent Dewey and the execution of the deed was logical under the tax plan asserted. Either "Uncle Sam" or Chad were getting the property. So it makes sense that Dewey would want to keep the property in the family. Todd helped arrange the meeting between Dewey and Wilcox to discuss deeding the property to Chad. This transaction was conducted to protect the property from sale without negatively impacting Dewey's Medicaid eligibility.

## CONCLUSION

The district court's summation of the evidence surrounding the June 2020 deed is astute:

> Todd and Chad *both* wanted to protect the Property from potential claims relating to Dewey's illness. When Wilcox told them they could do so by conveying the property to Chad, Todd and Chad *both* agreed, and they *both* came to an understanding that Chad would make it right with Todd down the road.
>
> . . . .
>
> . . . Todd's actions in arranging for Wilcox to speak to Dewey, driving Dewey to sign the deed, and then actually helping Dewey get in position to physically sign the deed, support the fact that he was a knowing and active participant. These actions make no sense unless Todd was fully onboard with the plan to deed the Property to Chad.

This estimation, as the district court acknowledges, does not directly answer the relevant question: can Todd prove by clear, convincing, and satisfactory evidence that Dewey lacked the mental capacity to execute a deed of the property to Chad? The inconclusiveness of the testimony, lack of expert witnesses, and the district court's witness credibility determinations all make clear that he cannot. We thus affirm.

**AFFIRMED.**